# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8674 | **DATE** | 8/2/2002 |
| **CASE TITLE** | Federal Deposit Insurance Corp. vs. David J. Wabick, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Even with the benefit of the discovery rule on the most generous assumption (with time measured from the return of the criminal indictment), FDIC's fraud claims are time-barred because they were not filed within three years of the date FDIC itself claims to have discovered its injury. Movant's motions to dismiss Counts II and IV are therefore granted. Their corresponding motions to dismiss Counts I and III are deferred pending FDIC's further submission called for in this opinion. FDIC is ordered on or before August 26, 2002 to respond to the question whether the Blumenthal interview sufficed to place RTC on inquiry notice to look into the issues that now form the gravamen of FDIC's actions.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

**AUG 0 5 2002**
date docketed

docketing deputy initials

8/2/2002
date mailed notice

SN
courtroom deputy's initials

CLERK, U.S. DISTRICT COURT

02 AUG -2 PM 2:49

FILED F.O.0
Date/time received in central Clerk's Office

SN
mailing deputy initials

**Document Number**

40

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL DEPOSIT INSURANCE     )
CORPORATION, etc.,            )
                              )
            Plaintiff,        )
                              )
        v.                    )     No.  01 C 8674
                              )
DAVID J. WABICK, et al.,      )
                              )
            Defendants.       )

**DOCKETED**

**AUG 0 5 2002**

### MEMORANDUM OPINION AND ORDER

Federal Deposit Insurance Corporation ("FDIC") has brought a four-count[1] Second Amended Complaint ("SAC") against a group of defendants, claiming to have been the victim of a fraudulent scheme to obtain defaulted real estate loans in a sealed bid auction. Three defendants--David Wabick ("David"), Patricia Wabick ("Patricia") and Lorraine Wabick ("Lorraine")--have filed independent motions to dismiss pursuant to Fed. R. Civ. P. ("Rule") 12(b)(6). Larry and Janelle Ettner ("Larry" and "Janelle," collectively "Ettners") have jointly filed their own Rule 12(b)(6) motion.[2]

Apart from any uniquely advanced arguments, each defendant has incorporated the statute of limitations and damages arguments

---

[1] Another count alleging fraudulent conveyance was dismissed voluntarily (FDIC Mem. 2 n.2).

[2] Whenever all moving defendants are referred to collectively, they will be termed "Movants" rather than "Defendants" (this serves to separate them from Paul Freitag ("Freitag"), the only defendant who has not joined in any of the motions to dismiss).

40

presented by Ettners, who have in turn incorporated the arguments made in their own earlier submissions.[3] After full analysis of the litigants' initial and supplemental briefing, this opinion concludes that FDIC's tort claims are time-barred and defers ruling, pending a further submission by FDIC, as to the timeliness or untimeliness of its contract claims.

### Motion To Dismiss Standards

For present purposes this Court accepts the SAC's well-pleaded allegations as true and must draw all reasonable inferences in FDIC's favor (see, e.g., <u>Johnson v. Rivera</u>, 272 F.3d 519, 520 (7th Cir. 2001)). And under Rule 12(b)(6) no claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" (<u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)). While defendants may raise the affirmative defense of the statute of limitations in a Rule 12(b)(6) motion, dismissal is appropriate only if the allegations of the complaint clearly show that the claim is time-barred (<u>Kauthar SDN BHD v. Sternberg</u>, 149 F.3d 659, 670 & n.14 (7th Cir. 1998)).

---

[3] On January 14, 2002 this Court ordered FDIC to submit a memorandum addressing the statute of limitations issues. That memorandum is cited here as "FDIC Lim. Mem." Ettners filed a response, cited as "E. Lim. Mem." This opinion uses the same "FDIC" and "E." initials in referring to all exhibits ("Ex."), memoranda ("Mem.") and reply memoranda ("R. Mem.").

## Defendants and Non-Party Participants

David and Larry formed Illinois corporation Gateway Capital in June 1992 (¶¶10, 25). At all times relevant to this action, David's wife Patricia owned one-half of the controlling interest in Gateway Capital, while Larry and his wife Janelle owned the other half (¶¶11-13). David and Larry managed, controlled and directed Gateway Capital's affairs (¶25). Gateway Kansas City, Inc. ("Gateway KC") was an Illinois corporation[5] formed on December 9, 1992 (¶17), and Larry was president and a director of Gateway KC (¶12). Connaught Corporation ("Connaught") is an Illinois corporation controlled by David (¶14). According to the SAC, David's mother Lorraine obtained all of Connaught's stock from him in a sham transaction designed to conceal Wabick's interest in that corporation (¶14). In a later transaction also labeled by FDIC as "sham," Lorraine transferred all of the Connaught stock to Freitag (¶15).

## FDIC as Successor to RTC

On December 31, 1995 FDIC became the statutory successor to

---

[4] Although the SAC is long and detailed, portions relevant to the limitations issue can be summarized rather succinctly. What follows is such a summary drawn from the SAC, cited "¶ --." For the most part the recital omits such language as "FDIC alleges" because the SAC is treated as gospel--but of course no factual findings are either made or implied here.

[5] Gateway KC has since been dissolved by the Illinois Secretary of State for non-payment of taxes (¶17).

Resolution Trust Corporation ("RTC") in all of its receivership
and conservatorship capacities (12 U.S.C. §§1441a(m)(1) and
(2)),[6] including the receivership of Home Federal Savings
Association of Kansas City ("Home Federal") (¶9). In accordance
with its statutory mandate, RTC had conducted numerous public
auctions to liquidate the assets of failed thrifts for which it
was receiver (¶19). Prospective auction participants were
required to make numerous certifications under penalty of
perjury, including (1) that they would not communicate with any
debtor regarding any asset without RTC consent, (2) that they had
no known material business relationship with any debtor under any
of the mortgage loans in the auction and (3) that there were no
defaults, by the prospective purchaser or its affiliates, on any
obligation to RTC, FDIC or the former FSLIC (¶¶20-21).

Sealed Bid Auction

Home Federal was the lender on a group of sub-performing
real estate loans known as the Merit Loans (¶22). Three
corporations (collectively the "Merit Entities") were the debtors
on at least some of those loans (id.), and Albert Ichelson, Jr.
("Ichelson") controlled or owned each of the Merit Entities
(¶23). Then on March 27, 1992 Home Federal was declared
insolvent, and RTC was appointed its receiver (¶24).

---

[6] All further citations to Title 12 provisions will take
the form "Section --."

4

In August 1992 RTC sought to sell the Merit Loans as part of a package of sub-performing real estate loans to be auctioned via sealed bids ("Sealed Bid Auction" or "Auction") (¶27). After Gateway Capital had obtained a bid package, David began to negotiate an arrangement with Ichelson and Merit Entities under which if Gateway Capital were the successful bidder on the Merit Loans in the Sealed Bid Auction, David (or entities he controlled) would (1) make substantial payments to Ichelson (or entities he controlled), (2) assume certain lease obligations and (3) employ Ichelson's son (¶¶27-28). According to FDIC, those negotiations were undertaken to induce Ichelson to take action designed to ensure that Gateway Capital would be the successful bidder, including providing David with confidential information and causing some of the Merit Entities to file bankruptcy before the Auction, reducing the apparent value of the Merit Loans to other bidders (¶29).

David engaged in further deceptive conduct to conceal his interest in Connaught. Because Connaught was not qualified to bid at the Sealed Bid Auction and because David was affiliated with Connaught, any company that David controlled (including Gateway Capital) would be similarly ineligible to bid (¶30). And that is why the "sham transactions" designed to shield David's involvement with Connaught were arranged (¶¶14-15, 31-32).

After submitting numerous certifications, David was informed

that Gateway Capital was eligible to bid in the Sealed Bid Auction (¶43). Gateway Capital did so and was told on October 28, 1992 that its bid was the highest (¶¶44-46). Before designating Gateway Capital as the winner, RTC required the corporation to certify further that it had no contact with any borrowers and had not disclosed any confidential information about the Merit Loans (¶47).

Gateway Capital executed the Purchase Agreement and, pursuant to RTC's requirements, transferred a deposit to RTC's bank account in Chicago (¶¶48-49). Before the closing Gateway Capital assigned its interest in the Purchase Agreement to Gateway LP, in which Gateway KC was a general partner (¶¶17, 50). On January 7, 1993 the Purchase Agreement was closed in Washington, D.C., and the balance of the purchase price was transferred to RTC's Chicago bank account (¶50).

According to the SAC, David, Patricia, Larry, Janelle, Lorraine and Freitag all engaged in a conspiracy to defraud RTC (1) by concealing David's and Larry's communications with Ichelson and (2) by concealing David's relationship to Connaught, Gateway Capital and Gateway KC, all with the goal of inducing RTC to allow Gateway Capital to participate in the Sealed Bid Auction (¶¶70, 91-94). In addition to that conspiracy claim, FDIC asserts claims for breach of contract and common law fraud against David, Patricia, Larry and Janelle (¶¶81-85), and it

seeks to impose a constructive trust on all profits realized by all defendants in connection with the assets purchased at the Sealed Bid Auction (¶¶86-90).

## Statute of Limitations

Movants seek dismissal of all four counts of the SAC on a variety of grounds, including their being time-barred. On that issue Movants bear the burden of persuasion (<u>Law v. Medco Research, Inc.</u>, 113 F.3d 781, 786 (7th Cir. 1998)).

All parties agree that FDIC's claims are governed by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). FIRREA provides its own statute of limitations (Section 1821(d)(14)(A))[7] for claims, such as this one, brought by FDIC as receiver: the longer of (1) six years for contract actions or three years for tort actions and (2) "the period applicable under State law." And as between the two potential

---

[7] Here is Section 1821(d)(14)(A)) in full:

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by [FDIC] as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

    (I) the 6-year period beginning on the date the claim accrues; or
    (II) the period applicable under State law; and

(ii) in the case of any tort claim..., the longer of—

    (I) the 3-year period beginning on the date the claim accrues; or
    (II) the period applicable under State law.

source-of-law candidates for the latter alternative:

> 1. Illinois' limitations periods for contract and property-injury tort actions are ten and five years respectively (735 ILCS 5/13-206 and 5/13-205).

> 2. In the District of Columbia,[8] a three-year statute of limitations applies to contract, unjust enrichment and fraud claims (D.C. Code §12-301(7) & (8)).

Thus FIRREA's unique limitations periods (the first statutory alternative) would apply unless the local law of Illinois (rather than the District) provides the applicable period.

But the problem is more complex than merely electing between the two statutory alternatives--instead a choice-of-law determination must be made at two different levels. And FDIC and Movants disagree not only about which state provides the alternative limitations period[9] but also about whether state or federal choice-of-law principles should be employed to answer that question.

Choice-of-Law Simpliciter

FDIC contends that Illinois choice-of-law rules control this litigation. Both sides agree that if FDIC is correct on that

---

[8] For simplicity of discussion, the District of Columbia (often spoken of here simply as "the District") will also be referred to as a "state" in this opinion.

[9] As the later discussion reflects, that issue is further complicated in this case by the need to consider whether and how the "discovery rule" operates.

score, this Court must apply Illinois statutes of limitation as procedural rules controlled by the forum state, even if another source of law is looked to for substantive purposes (<u>Singletary v. Cont'l Ill. Nat'l Bank & Trust Co.</u>, 9 F.3d 1236, 1242 (7th Cir. 1993))(FDIC Mem. 5, E. R. Mem. n.1). To save its claims FDIC predictably seeks to invoke Illinois' longer limitations periods. On the other side of the coin, in their effort to avoid the application of the Illinois limitation periods, Movants argue that federal rather than state choice-of-law rules properly determine which state provides the limitations periods for purposes of FIRREA's second alternative.

Whether a federal court exercising federal question jurisdiction over claims that hinge upon state law should apply federal common law choice-of-law rules or the choice-of-law rules of the forum state is a question on which the circuits have differed (compare <u>In re Gaston & Snow</u>, 243 F.3d 599, 604-07 (2d Cir. 2001) and <u>FDIC v. Nordbrock</u>, 102 F.3d 335, 337 (8th Cir. 1996) with <u>In re Lindsay</u>, 59 F.3d 942, 948 (9th Cir. 1995) and <u>Edelmann v. Chase Manhattan Bank, N.A.</u>, 861 F.2d 1291, 1294 & n.14 (1st Cir. 1988)). For its part, the Seventh Circuit has distinguished diversity cases, where <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941) requires a federal court to apply the choice-of-law principles of the state in which it sits, from cases deemed to arise under federal law--see <u>RTC v. Chapman</u>, 29

F.3d 1120, 1124 (7th Cir. 1994) (citations omitted in part):

> Federal law may well look to state law for substantive
> principles, but which law to select is itself a question of
> federal law, as [United States v. Kimbell Foods, Inc., 440
> U.S. 715 (1979)] and O'Melveny & Myers [v. FDIC, 512 U.S. 79
> (1994)] show. The Supreme Court in O'Melveny & Myers did
> not ask what law a state court would have selected; it
> approached the question as one for independent decision.

Federal jurisdiction here is premised on Section 1819(b)(2)(A),
which provides--as did the statute in Chapman--that suits to
which FDIC is a party "shall be deemed to arise under the laws of
the United States." Thus Chapman directs the use of federal
choice-of-law principles in this case.[10]

## Federal Choice-of-Law Analysis

Both sides agree that the relevant principles in undertaking
a federal choice-of-law analysis are provided by the Restatement
(Second) of Conflict of Laws ("Restatement") (FDIC Mem. 11-18, E.
Lim. Mem. 7-10, E. R. Mem. 7). Yet despite their agreement to
look to the Restatement, neither side has examined the choice-of-
law analysis through the lens of Restatement §142, which

---

[10]    Although Atherton v. FDIC, 519 U.S. 213, 224-25 (1997)
effectively overrode Chapman's resolution of the substantive
law question in that case (as this Court recognized the very next day
in FDIC v. Gravee, 966 F. Supp. 622, 640 (N.D. Ill. 1997)),
Atherton did not invalidate Chapman's choice-of-law analysis.
Instead it simply held that Chapman's application of the relevant
choice-of-law principle had drawn the wrong conclusion in
applying federal substantive law. Moreover, it is irrelevant to
this issue that Chapman was a split decision, for both the
dissent and the majority opinion followed the same approach to
the choice-of-law analysis--they just reached different results
in applying the analysis to the situation before the court.

specifies that the forum state should not apply its own statute
of limitations that would otherwise treat a claim as timely filed
_if_ another state has a more significant relationship to the
action and _if_ maintenance of the suit would serve no substantial
interest of the forum.[11]

As the ensuing analysis makes clear, the District has the
most significant relationship to FDIC's claims.  Because an
application of the more permissive Illinois statute of
limitations would be at the expense of the more significant
interests of the District, whose limitations periods would bar
the claims, whatever interest Illinois has in maintaining this
action is outweighed.[12]  District law thus supplies FIRREA's

---

[11]  Restatement §142 reads:

Whether a claim will be maintained against the defense of
the statute of limitations is determined under the
principles stated in §6.  In general, unless the exceptional
circumstances of the case make such a result unreasonable:

(1)  The forum will apply its own statute of limitations
     barring the claim.

(2)  The forum will apply its own statute of limitations
     permitting the claim unless:

     (a)  maintenance of the claim would serve no
          substantial interest of the forum; and
     (b)  the claim would be barred under the statute of
          limitations of a state having a more significant
          relationship to the parties and the occurrence.

[12]  Neither party intended Illinois or District law to
govern their contractual relationship.  One provision in the
Purchase Agreement clearly expresses the parties' intention that
New York law govern (SAC Ex. 20 ¶13.9), but Section

11

alternative limitations periods.

Which state has the most significant relationship to a particular issue is determined in accordance with the principles set forth in Restatement §6(2):

> (a)  the needs of the interstate and international systems,
> (b)  the relevant policies of the forum,
> (c)  the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d)  the protection of justified expectations,
> (e)  the basic policies underlying the particular field of law,
> (f)  certainty, predictability and uniformity of result, and
> (g)  ease in the determination and application of the law to be applied.

As different contacts are used to apply those principles to tort claims (Restatement §§145(1)) and contract claims (_id_. §188(1)), this opinion examines each of FDIC's claims in turn.

Tort Claims

FDIC has asserted two tort claims: Count II alleges common law fraud and Count IV alleges conspiracy to commit fraud (¶¶ 83-85, 91-94).  Restatement §145(2) identifies as the contacts to be considered in the most-significant-relationship analysis for tort claims "(1) the place where the injury occurred, (2) the place

---

1821(d)(14)(A) specifically excludes consideration of "any provision of any contract" concerning statute of limitations issues (see also Nordbrock, 102 F.3d at 338).  As no one has argued that New York is the state with the most significant relationship to this action, that possibility is not addressed here.

where the conduct causing the injury occurred, (3) the domicil,
residence, nationality, place of incorporation and place of
business of the parties and (4) the place where the relationship,
if any, between the parties is centered." Just where those
factors point is hotly debated by the parties, with FDIC pushing
for Illinois and Movants championing the District.

As for the first factor, Movants maintain that the asserted
pecuniary injury (¶ 38) occurred in the District, where RTC was
headquartered (E. Lim. Mem. 10). FDIC counters that the injury
extended beyond RTC's headquarters and was certainly felt in
Illinois, where the purchase money for the Merit Loans was
deposited (FDIC Mem. 15-16).

While FDIC's argument that injury was "ultimately felt all
around the country" (FDIC Mem. 16) might conform to some
artificial construct, it seems self-evident that RTC, a federal
corporation, felt the economic impact of defendants' fraud in the
District, where it had its principal place of business. After
all, is it accurate in real world terms to say that the existence
of a bank account at some location means that an inadequate
deposit to that bank account has injured the account's owner,
whose business is based elsewhere, at the situs of the account?
Hardly.

But even on FDIC's theory of some sort of multistate injury
(a dubious premise at best), that would not make Illinois the

state with the most significant relationship. FDIC argues that
in situations where the injury was suffered in two or more states
or where the place of injury cannot be ascertained, the place of
injury does not play a significant role in determining applicable
law and "the place where the defendant's conduct occurred will
usually be given particular weight" (Restatement §145 cmt. e; see
also Hercules & Co. v. Shama Restaurant Corp., 566 A.2d 31, 42
(D.C. App. 1989)(in cases involving economic loss, the place of
injury is less significant for choice-of-law purposes than in
personal injury cases)). But even apart from the unitary
location of RTC's injury (the District), that argument does not
help FDIC, for the District also has a far stronger claim than
Illinois to be viewed as the place where the conduct giving rise
to the injury occurred.

Movants correctly contend that because the negotiation and
closing of the Purchase Agreement in the District brought their
alleged tortious conduct to fruition, the second Restatement
factor points there (E. Lim. Mem. 10). To be sure, some of the
assertedly fraudulent conduct leading to that result was
Illinois-based: some of David's communications with Ichelson
(¶¶28-29, 37), the "sham" sales of David's Connaught stock (¶¶30-
32) and the concealment of the fraudulent activities through
corporate formalities and false and misleading documentation

(¶¶71-80).[13] But the conduct that ultimately caused FDIC's injury was the deception that induced RTC to allow Gateway Capital to bid on and obtain the Merit Loans (¶84). That was achieved through misrepresentations (1) directed to RTC in the District,[14] (2) relied upon by RTC in the District and (3) consummated at the closing in the District when the Merit Loans were ultimately handed over to the fraudulent bidder. RTC's actions in reliance on defendants' fraudulent representations, a necessary element of FDIC's common law fraud claim (Alicke v. MCI Communications Corp., 111 F.3d 909, 912 (D.C. Cir. 1997)), occurred in the District when RTC made and implemented its deal with Gateway based on false and misleading information.

FDIC Mem. 14-15 maintains that because Gateway Capital and all defendants are domiciled in Illinois (¶16), the third factor points there. But Movants respond persuasively that domicile has no special significance in this case (E. Lim. Mem. 9). As already said, RTC's headquarters and principal place of business are in Washington D.C., although the RTC office responsible for the receivership of Home Federal was in Kansas City (FDIC Mem.

---

[13] Some fraudulent conduct also occurred in Iowa (¶¶37, 40), but that does not affect the result.

[14] That certain fraudulent representations were made in correspondence or phone calls originating in Illinois is of no real moment, for RTC in the District was most often at the other end of those communications.

14-15). Thus the third factor favors no particular state.

Lastly, Movants stress that the parties' relationship centered in the District because RTC was the "governmental entity that wholly controlled all aspects of a non-negotiable bidding process" from its headquarters there (E. Lim. Mem. 10). FDIC counters that in its view there was no single place where the relationship centered (FDIC Mem. 16-17). But its argument that RTC's control over the contracting process is irrelevant to a tort analysis is rejected as unpersuasive--RTC controlled the contracting process that was the vehicle for defendants' alleged fraud. And as pointed out earlier, the District--as the location of the closing--was where the fraudulently-obtained relationship was ultimately consummated. This factor too favors the District.

Thus, although not all of the Restatement §145(2) factors point strongly in the same direction, on balance the analysis heavily favors the District. This Court therefore holds that the District is indeed the "state" with the most significant relationship to FDIC's tort claims, a result that comports with the compelling interest of Washington, D.C. in regulating fraud perpetrated against businesses and agencies there.

Contract Claims

FDIC has advanced two claims that fall under FIRREA's limitations period for contract claims: breach of contract in

Count I and unjust enrichment in Count III[15] (¶¶81-82, 86-94).

Restatement §188(2) specifies these contacts as useful in

determining the state with the most significant relationship to

contract issues: "(1) the place of contracting, (2) the place of

negotiation of the contract, (3) the place of performance, (4)

the location of the subject matter of the contract and (5) the

domicil, residence, nationality, place of incorporation and place

of business of the parties." As with the tort issues, the

parties are sharply divided as to which state prevails in the

contracts analysis.

Restatement §188 defines the "place of contracting" as the

place where the last act necessary to make the contract binding

occurred (id. cmt. e). FDIC maintains that it was defendants'

execution of the Purchase Agreement, rather than the final

closing some two months later, that bound the parties (FDIC Mem.

12-13). Although David faxed the signature pages executed on

behalf of Gateway Capital from Illinois to RTC on November 12,

1992, those pages had not been signed by RTC (¶48, SAC Ex. 21).

---

[15] One added fillip has been provided by the parties'
disagreement as to whether FDIC's unjust enrichment claim sounds
in tort or contract. Authorities cited by FDIC (United States v.
First Nat'l Bank, 957 F.2d 1362, 1370-72 (7th Cir. 1992); FDIC v.
Bank One, Waukesha, 881 F.2d 390, 392-93 (7th Cir. 1989)) have
the better of it, and they teach that an unjust enrichment claim
brought by the federal government looks to the statute of
limitations applicable to contract actions. So FIRREA's express
six-year limitations period for contract actions applies to Count
III unless the applicable state law provides a longer period.

FDIC has of course not argued that the signature of only one party to the Purchase Agreement made it legally binding on both--and it has not said that RTC had previously executed the document. It is thus unclear whether the Gateway Capital signature was the last act necessary to make the contract binding or whether instead RTC's signature then remained a precondition. Because the District was the undisputed location of the closing on the Purchase Agreement on January 7, 1993 (¶50) and because the record leaves it uncertain when and where the Purchase Agreement became legally binding, the first factor at least seems to point to the District.

As the further discussion reflects, however, the District would prevail in the weighted analysis even if this factor of final-signature-on-the-document went the other way. Technicalities as to the "place of contracting" in that sense--particularly in a transaction that is not consummated in a face-to-face meeting--were given greater force before choice of law analysis became more sophisticated. Now less weight in the choice of law determination is ascribed to traditional offer-and-acceptance notions, based on where the last signature was affixed to a fully-negotiated and agreed-upon contract. And that is certainly the case where, as here, the negotiation of the Purchase Agreement was carried on between FDIC's lawyers in Washington, D.C. and Gateway's lawyers in Boston--not in

Illinois. Under those circumstances, any attachment of
meaningful significance to an Illinois signing by one side would
be extraordinarily mechanistic and truly unpersuasive.

As to the second factor, FDIC would have it that the
negotiations resulting in the Purchase Agreement are the relevant
ones and that those negotiations point (if anywhere) to Illinois
(FDIC Mem. 14). Very little negotiation took place before the
bid, for the bidding was entirely pursuant to FDIC's policies (E.
R. Mem. 9). Most of the cited contacts involved one party in
Illinois and the other in the District, rendering it difficult to
say that one rather than the other was the dominant location of
the pre-closing negotiations. But as the final negotiations at
the closing were undoubtedly in the District, on balance that
factor also points to that state.

It is the place of performance that most clearly illuminates
this analysis. FDIC argues that because payment was made to an
Illinois bank the contract was performed in Illinois (FDIC
Mem. 14). But even apart from the superficial (and artificial)
nature of that construct,[16] Purchase Agreement (SAC Ex. 20) §4.4
imposed further requirements on the purchaser--the execution and
delivery of specified documents. Although neither party has
focused on that aspect, that obligation was most likely performed

---

[16] See the earlier comment along the same lines in the
"place of injury" portion of the tort claim analysis.

at the closing in the District. But even more significantly, the purchaser's performance is only half of the story--and without question RTC's performance occurred in the District: Purchase Agreement §§2.1 and 4.3 required it to execute or produce, at the closing there, the documents necessary to transfer ownership of the Merit Loans (SAC Ex. 20). When all of the relevant considerations are taken into account, then, the third factor also weighs--this time heavily--in favor of the District.

Both sides agree that the location of the subject matter of the contract (here real estate loans made on properties located in Iowa, Indiana, Ohio and Nebraska (¶22)) bears minimal weight in the choice of applicable law (FDIC Mem. 14; E. Lim. Mem. 9). And as before, the domiciles and places of business of the parties are in multiple states, adding nothing significant to the analysis.

In summary, the District clearly has an interest in FDIC's contract claims far superior to that of Illinois. Here this Court holds that the District has the most significant relationship to those claims.

<u>Applicable Limitations Periods</u>

<u>Fraud</u>

FDIC filed its initial complaint on November 9, 2001, and under Rule 15(c)(2) its two amended complaints relate back to that date. Because this opinion has held the District supplies

the "period applicable under State law" for purposes of Section 1821(d)(14)(A), FDIC's claims of fraud and conspiracy to commit fraud are necessarily time-barred. D.C. Code §12-301(8) specifies a three-year limitations period for such claims, so FIRREA's express three-year period in Section 1821(d)(14)(A)(ii)(I) is not enlarged. Even if FDIC could prove that it did not discover its injury until Wabick's indictment in June 1997 (a subject discussed hereafter), FDIC still failed to file its complaint within three years of that date. Accordingly Counts II and IV are ordered dismissed as to all defendants.

Breach of Contract

Because FDIC's breach of contract claims are also subject to a three-year limitations period under D.C. Code §12-301(7), FIRREA's express six-year statute of limitations for contract claims in Section 1821(d)(14)(A)(i)(I) applies to Count I. If then those claims accrued before November 9, 1995, they too are time-barred.

In contrast to the earlier-discussed limitations period "applicable under State law," FIRREA's six-year limitations period is a federal statute of limitations, to which federal accrual doctrines then apply (Singletary, 9 F.3d at 1242). In that respect, federal common law incorporates the "discovery rule" into statutes of limitations in federal question cases unless there is a contrary directive from Congress (Cada v.

Baxter Healthcare Corp., 920 F.2d 446, 450 (7ᵗʰ Cir. 1990); see
also Bishop v. Gainer, 272 F.3d 1009, 1014 (7ᵗʰ Cir. 2001)).
That doctrine postpones the beginning of the limitations period
from the date when a plaintiff is wronged to the date when
plaintiff knew or should have known about its injury (Ferguson v.
Roberts, 11 F.3d 696, 704-05 (7ᵗʰ Cir. 1993); Cada, 920 F.2d at
450). Its application is not strictly limited to tort cases--the
rule has also been applied in breach of contract actions where
the injury is not readily apparent (see Connors v. Hallmark & Son
Coal Co., 935 F.2d 336, 342-43 (D.C. Cir. 1991)).

It is plaintiff's burden to show the applicability of the
discovery rule (Cathedral of Joy Baptist Church v. Village of
Hazel Crest, 22 F.3d 713, 717 (7ᵗʰ Cir. 1994)), although on
motions to dismiss such as the present ones plaintiff need show
only that the rule would apply under some set of facts that could
be proved consistently with the complaint's allegations (Hishon,
467 U.S. at 73). Although a court normally considers only those
allegations for Rule 12(b)(6) purposes (Levenstein v. Salafsky,
164 F.3d 345, 347 (7ᵗʰ Cir. 1998)), Rule 12(b) makes it
discretionary whether to consider additional submissions and
thereby to convert the motion into one for summary judgment
(id.).[17]

---

[17] Although the Rule 12(b) conversion provision does not
directly address the matter, our Court of Appeals has also
applied that approach to affirmative defenses raised in a Rule

22

In this instance, even with the information contained in the materials Movants have submitted being taken into account, it is not yet appropriate to rule on the dismissal of FDIC's breach of contract claim. As to RTC's discovery of its injury, FDIC has argued (FDIC Lim. Mem. 5):

> Here, a grand jury returned an indictment against Defendant Wabick on June 12, 1997. At that point, FDIC knew, as it should have, that it had been injured by wrongful conduct.

Movants have responded (E. Lim. Mem. 4-5):

> On the day of the bid, October 27, 1992, the RTC received a letter from one of the other bidders claiming that another bidder had impermissible contact with Ichelson (the debtor under the Merit Loans). (Ex. 2, attached hereto.) Apparently, the RTC told the other bidder that all bidders had signed a confidentiality agreement, which satisfied the other bidder.

> The Department of Justice was not as satisfied, and it began an investigation concerning the bid process in 1993. (Freeman Decl., ¶1, attached hereto as Ex. 3.) In or about 1993, Gateway, Ettner and Wabick received grand jury subpoenas in connection with the investigation. (Freeman Decl., ¶2.) In addition, the DOJ interviewed persons at the RTC. Specifically, on or about July 20, 1994, the DOJ interviewed Martin Blumenthal, the RTC's Contractor Ethics Program Manager. The memorandum of that interview demonstrates that Blumenthal "was confronted with two issues:" (i) Wabick and Ettner's alleged contact with Ichelson; and (ii) Wabick's relationship to Connaught, and the impact it would have on the RTC if partnerships affiliated with Connaught were in default on RTC loans. (Ex. 2, passim.)

Movants have also submitted a copy of the FBI report on the just-

---

12(b)(6) motion (see, e.g., <u>D&K Props. Crystal Lake v. Mut. Life Ins. Co. of N.Y.</u>, 112 F.3d 257, 259 n.1 (7th Cir. 1997)).

referred to DOJ interview of Martin Blumenthal ("Blumenthal Interview Report," E. Lim. Mem. Ex. 2)[18] and an affidavit from the lawyer for David and Larry in the criminal investigation ("Freeman Affidavit," E. Lim. Mem. Ex. 3).

At least at this stage, it cannot be said that there is no set of facts under which FDIC would be entitled to benefit from the discovery rule. First, as to the competing bidder's October 1992 letter, what has been tendered does not necessarily convey the implication that the letter was also the impetus for the DOJ's investigation, a situation in which FDIC could scarcely contend that RTC was not also placed on inquiry notice right then and there (see Freeman Aff. ¶1).

But what is far more problematic for FDIC, to say the least, is the Blumenthal Interview Report. In June 1994 attorneys from DOJ's Fraud Section questioned Blumenthal, who was RTC's Ethics Program Manager, as to (1) the Sealed Bid Auction, (2) David's relationship to Gateway Capital, (3) David's potential connection with defaulted borrower Connaught and (4) the effect that any such connection would have on David's ability to bid on RTC property (E. Lim. Mem. Ex. 2). It is extraordinarily difficult (indeed, that seems likely to qualify as an understatement) to fathom how such an inquiry--made by Department of Justice lawyers expressly designated to investigate <u>fraud</u> and directed to the man

---

[18]    That exhibit is attached as an appendix to this opinion.

in charge of RTC's Ethics Program--could have failed to alert RTC
to the need for further inquiry regarding Gateway Capital's bid
in the Sealed Bid Auction.  Nor is such a duty to inquire
diminished (let alone eliminated) by the cautious way in which
the DOJ lawyers couched their questions.  Criminal investigations
must be kept under wraps until they become public (normally by
the return of an indictment), and the very nature of the
inquiries as described in the Blumenthal Interview Report would
seem to have stimulated any non-ostrich (and RTC's Ethics Program
Manager would surely qualify for that label) to pursue actively
the possible existence of problems broadly suggested by those
inquiries.

RTC was surely not entitled to wait until it knew
conclusively that it had been the victim of a criminal fraud
before beginning to investigate its civil claims.  To benefit
from the discovery rule, potential plaintiffs must exercise due
diligence to uncover their injuries.  As United States v. Duke,
229 F.3d 627, 630 (7th Cir. 2000) has put it:

> The discovery rule does not permit the victim of an
> alleged wrong to postpone the running of the statute of
> limitations by willfully closing his eyes, ostrich-
> like, to a known probability that he has been injured,
> even if he is not certain.

If the materials tendered up to this point tell the entire
relevant story, it would seem clear that the Blumenthal interview
provided RTC with inquiry notice such that it reasonably should

have uncovered its injuries well before November 9, 1995 (six years before it filed its original complaint in this action). And that takes ample account of RTC's entitlement to a reasonable period of time to investigate what was plainly suggested in the Blumenthal interview before the statute of limitations clock can fairly be said to have begun ticking. On that score the 16-1/2 months between the date of the Blumenthal interview and November 8, 1995 would seem more than enough to bar the claims on limitations grounds.

While FDIC correctly posits that application of the discovery rule is often a fact-driven jury question, where it is apparent from undisputed facts that only one conclusion may be drawn the question is one for the court (<u>Cathedral of Joy Baptist Church</u>, 22 F.3d at 719). This seems to be just such a case. But because Movants submitted the material detailing the Blumenthal interview as an attachment to its Limitations Memorandum (filed in response to FDIC's memorandum on the same subject), FDIC has not yet had an adequate opportunity to reply to the issue framed here. Its response to Movants' motions to dismiss could not have been expected to address the subject--absent a direction from this Court to do so, FDIC cannot be expected to have addressed the merits of Movants' supplemental materials on the limitations question in the FDIC memorandum devoted to defending the legal sufficiency of its Complaint.

Accordingly FDIC is ordered on or before August 26, 2002[19] to respond to the question whether the Blumenthal interview sufficed to place RTC on inquiry notice to look into the issues that now form the gravamen of FDIC's actions. And because the operation of the discovery rule may be fully dispositive of this action, the matter partakes in a way of the nature of a summary judgment--so FDIC's necessary factual submissions will be required to conform to the standards of Rule 56(e)(but not to the added demands of this District Court's LR 56.1). This Court will then determine whether anything more is needed to enable it to deal with the motions to dismiss Count I as time barred.

One sub-issue can be resolved at this time, however, at least in terms of the submissions now before this Court. In those terms this Court does not buy Movants' argument that DOJ's knowledge, wherever and however acquired, is automatically to be imputed to RTC/FDIC (E. Lim. Mem. 13). For one thing, the cases on which Movants rely for that purpose are meaningfully distinguishable. Unlike the situation in <u>United States v. Kass</u>, 740 F.2d 1493 (11th Cir. 1984), here there is no argument that DOJ, the organization with purported knowledge of defendants'

---

[19] That is somewhat longer than would ordinarily be afforded for such a response, for it must have been obvious to FDIC for some time that this issue would have to be confronted. But because the normal time frame would call for a filing when this Court will be away, an added cushion has been built into this order.

fraud, was acting as an agent of RTC/FDIC. Nor is there any indication that the knowledge of defendants' fraud even approached the pervasiveness or the detail described in <u>United States v. Village of Island Park</u>, 791 F.Supp. 354, 363-64 (E.D. N.Y. 1992). Finally, FDIC and DOJ are separate agencies, unlike the scenario in <u>United States v. Kensington Hosp.</u>, No. 90-5430, 1993 WL 214446, at *12 (E.D. Pa. Jan. 14).

## Unjust Enrichment

As for FDIC's unjust enrichment claim, courts in the District have applied the three-year statute of limitations for breach of contract actions to unjust enrichment claims arising from the same conduct (see, e.g., <u>Constr. Interior Sys., Inc. v. Donohoe Cos.</u>, 813 F.Supp. 29, 33 n.4 (D. D.C. 1992) and the D.C. Cir. case cited there). Because that is shorter than FIRREA's express six-year period under Section 1821(d)(14)(A)(i)(I), the latter time frame also applies to Count III. Hence this Court will deal with FDIC's Count III unjust enrichment claim on the same basis as its Count I breach of contract claim.[20]

## Conclusion

Under federal choice-of-law rules, the District supplies

---

[20] FDIC derives no benefit from its allegations that the source of defendants' unjust enrichment was the 1999 sale of the assets wrongfully obtained in the Sealed Bid Auction (¶¶87-89). To the contrary, the unjust enrichment took place when the assets were wrongfully acquired in 1992--conversion of the assets to cash at a later date did not restart the limitations clock anew.

FIRREA's alternative limitations periods for all of FDIC's claims--three years each for fraud, breach of contract and unjust enrichment. That being so, FIRREA's express three-year period for fraud claims and its six-year period for contract claims are not extended by the "period applicable under State law."

Even with the benefit of the discovery rule on the most generous assumption (with time measured from the return of the criminal indictment), FDIC's fraud claims are time-barred because they were not filed within three years of the date FDIC itself claims to have discovered its injury. Movants' motions to dismiss Counts II and IV are therefore granted. Their corresponding motions to dismiss Counts I and III are deferred pending FDIC's further submission called for in this opinion.[21]

Milton I. Shadur
Senior United States District Judge

Date: August 2, 2002

---

[21] In the meantime, the potentially dispositive nature of the statute of limitations issue counsels the deferral of any consideration of Movants' further arguments in support of their motions to dismiss Counts I and III. If those arguments are not mooted by the final ruling on the limitations issues, they will be addressed thereafter.

FD-302 (Rev. 3-10-82)

– 1 –

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___8-3-94___

       MARTIN BLUMENTHAL, Contractor Ethics Program Manager, Office of Ethics, RESOLUTION TRUST CORPORATION (RTC), 1801 17th Street, N.W., Washington, D.C. 20434, telephone (202)416-2029, was contacted and interviewed concerning any information he may have had concerning the sale of RTC assets to a group of investors known as GATEWAY CAPITAL ADVISORS of Chicago.  The interview was conducted in the presence of the Department of Justice, Fraud Section Attorneys, MIKE LOVE and NANCY BRINKAC and BLUMENTHAL furnished the following information:

       DOJ Attorney MIKE LOVE provided a summary background of events leading to an October 27, 1992 sale of RTC assets via the bidding process.  In summer 1991, HOME FEDERAL SAVINGS of Kansas City failed and was taken over by the RTC.  The assets of HOME FEDERAL were pooled together in four separate pools, three of which ultimately went through the bidding process.  The national sales center for RTC collaborated with SECURED CAPITAL CORPORATION of Los Angeles, California, the RTC financial advisor.  The due-diligence contractor, RER, analyzed the assets for the RTC contained in the three pools.  "Pool two" of the three pools contained 29 properties, 16 of which belonged to AL ICHELSON's MERIT general partnership located in Des Moine, Iowa. GATEWAY CAPITAL ADVISORS of Chicago submitted the high bid of $66.5 million for the purchase of the notes in pool two and was awarded the notes.

       BLUMENTHAL was confronted with two issues.  Contacts between bidders and dominant borrowers were mentioned in a KELVIN DAVIS letter delivered to the RTC on the date of the bid. DIANE CRAWFORD of RTC's national sales office placed a telephone call to KELVIN DAVIS of TOBAR to determine where he got the information that a bidder and the largest borrower in the pool had prohibited contact.  DAVIS declined to either reveal the source or further substantiate his allegation.  He was satisfied by DIANE CRAWFORD that each of the pool two bidders had signed a confidentiality agreement.  He refused to name names.

---

Investigation on __7-20-94__    at __Washington, D.C.__    File # __29B-DL-65153__

by __SA MICHAEL S. POCHE/rg__ _____ Date dictated ____7-27-94____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 11-15-83)


B-DL-65153


Continuation of FD-302 of ___ MARTIN BLUMENTHAL _____, On __7-20-94__ , Page __2__


      Secondly, LARRY ETTNER had been involved in some aspect
of SOUTHMARK SAVINGS out of Dallas, Texas.  ETTNER was required
to submit supplemental information which explained his
association with SOUTHMARK and his responsibilities there.  The
bid winners, WABICK and ETTNER, were required to re-certify that
they had no contact with the borrowers.

      BLUMENTHAL thought any contact would be covered under
the "default policy".  He referred to the July 17, 1992
"Collection Policy" which was issued by then Senior VP for Asset
Management Sales, LAMAR KELLY.  BLUMENTHAL's ethics group would
not be the group to check with concerning contacts by bidders and
borrowers.

      DOJ Attorney MIKE LOVE proposed a hypothetical
situation in which a major bidder, GCA; a principal of GCA,
WABICK, who owned 100% of the stock of CONNAUGHT.  If
partnerships in which CONNAUGHT was the general partner were in
default on loans which were assets of FDIC or RTC, would WABICK
be precluded from bidding.

      BLUMENTHAL advised that certainly as of this time
WABICK will be precluded because of the existence of the
"collection policy".  That policy, of course, prohibited a
defaulted borrower from bidding on other assets owned by the RTC.
BLUMENTHAL also thought that WABICK would have been precluded
from bidding on the pool two notes, even during the October 1992
time frame.  He stated flatly that the collection policy kept
general partners from bidding on RTC property if they were in
default on other obligations.

      BLUMENTHAL stated that during the Fall of 1992, the RTC
began a policy of having bidders sign a certification if RTC
thought the bidder had a "problem".  The problem he was referring
to was defaulted loans.  The certification covered "affiliated
business entities" which is defined as a related entity to the
one making the bid.

      The related entity is defined as one who is controlled
by or has common control of the bidder.